A. M. Cohron v. Commissioner.
Cohron v. Commissioner
Docket No. 16566.
United States Tax Court
1949 Tax Ct. Memo LEXIS 206; 8 T.C.M. (CCH) 398; T.C.M. (RIA) 49101; April 28, 1949
H. Pierce Witmer, Esq., Savings & Loan Bldg., Des Moines, Ia., for the petitioner. George E. Gibson, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding is brought for a redetermination of a deficiency of $17,591.70 in petitioner's income tax for 1943. By reason of the Current Tax Payment Act, 1942 is also involved. Respondent's inclusion in petitioner's income of the entire earnings for 1943 of a "partnership" between petitioner and his 18-year old son, and the wages earned by the son during the year in question, is the subject of the present dispute. Findings of Fact Petitioner has been engaged in the general contracting and construction business in Des Moines, Iowa, for 25 years. He filed his Federal income tax return for 1943 with the collector *207 of internal revenue for the district of Iowa. Petitioner is married and has a daughter and a son, Donald P. Cohron. Petitioner had an operation in April, 1940, from which he was slow in recovering. He engaged in practically no business in 1941. Donald graduated from high school in January, 1942, at which time he was 18 years old. His sister had gone to college and both he and his parents had planned that he should do so also and study engineering. Due to the war and petitioner's health, he did not enter college. He continued to live at home. Petitioner's father informed him that his health was such that he might have to quit the construction business; that if Donald went away to school he would not have a business to come back to; that he could forget college and devote full time to the business which they would own together. On January 2, 1942, petitioner and Donald executed a document entitled "Partnership Agreement," which had been drafted by C. L. Cram, an attorney who helped keep petitioner's books and prepared his income tax returns. The agreement recited that petitioner and his son, Donald, were to become partners in the business of general contracting and construction *208 under the name of A. M. Cohron & Son for 20 years, or until sooner terminated by mutual consent. Both were to devote their full time to the business and neither was to engage in any other business. Donald was to "devote as much time as possible in the field." It was provided "that if either partner is at any time called into any division of our Country's armed forces because of any national emergency then the remaining partner shall diligently carry on the business of the partnership for the benefit of both partners during the time the other partner is serving in said armed forces." Petitioner was to act as general manager and was to "do all the estimating and bidding of all construction work sought by the partnership," and was to have the "final word in any disagreement arising between the partners." The capital was to be "whatever the partners shall agree on as the time goes on." At first petitioner was to furnish the necessary operating capital, and was also to bring into the partnership the contracting equipment owned by him. Donald was either to bring in enough funds to match petitioner's investment "or to leave in his share of the profits * * * until he has an equal investment *209 * * *." Any additional capital was to be brought in by petitioner and Donald in equal shares. Books of account were to be kept and each partner was to have free access at all times to examine them. Both partners were to share equally the profits and losses of the business and were entitled to draw their respective shares of the net profits at the close of each year, "except the share of the said partner, Donald P. Cohron, shall be subject to" the provisions above. It was provided that each partner might - "* * * draw out of the net profits of the said business for his separate use, in such amounts as the partners may orally agree; but in case, at the end of any year, it shall appear, upon taking the general annual account, that if either partner has withdrawn from the business an amount over and above his share of the profits for the preceding year, then said partner shall repay to the partnership the excess amount of the sum which he shall actually have received over the sum which he shall have been entitled to receive as his share of the net profits for the preceding year." On January 2, 1942, Donald executed a note to petitioner in the amount of $6,768.77. At that time Donald *210 had no money of his own. The note was discharged with interest out of business profits at the end of 1942. After the agreement of January 2, 1942, and in April or May of that year, A. M. Cohron & Son secured a small job from the Rock Island Railroad to do some drainage work along its right-of-way and through a farm near Des Moines. The work lasted about a month. Donald laid out the job and ran the machinery - a dragline. After the completion of the Rock Island job, work was undertaken on a job in Des Moines known as the Second Avenue project. A. M. Cohron & Son joined several other contractors on this job which was taken in the name of Kramme & Jensen, who did the administrative work, and the other contractors, including A. M. Cohron & Son, furnished the machinery and operators. The work was in connection with building bridges and culverts, excavating and steel and piling work. Petitioner was not on that job at all. Donald was there every day running machinery until he went to Washington. In a Partnership Return of Income for 1942 A. M. Cohron & Son reported $5,118.63 as gross profit from the above jobs. In June, 1942, petitioner upon urging by Donald went to Washington, D. *211 C., and learned he could get a contract with the District of Columbia Government to construct a bridge, sea wall and separation grade crossing at the Tidal Basin if he could give a bond. He was not able to obtain the bond and sought help from Kramme & Jensen, without success. He then approached Alexander & Repass, a Des Moines contracting firm. Alexander and petitioner returned to Washington and successfully negotiated the contract for the construction of Project DA-WR-4B. Donald double-checked petitioner in estimating the job. Donald had been estimating since he was 15 years old. This was their practice in order to reduce the chance of bidding a job they should not take. On June 15, 1942, A. A. Alexander, M. A. Repass, and petitioner executed "Articles of Agreement" for the performance of Project DA-WR-4B. They recited and provided, inter alia, as follows: "* * * the parties hereto are all engaged in the general contracting business, A. A. Alexander and Maurice A. Repass owning the firm of Alexander & Repass, General Contractors, and A. M. Cohron owning the controlling interest in the firm of A. M. Cohron & Son, General Contractors, and the parties desiring to combine their efforts *212 have negotiated a contract between the Government of the District of Columbia, on the one part, and Alexander & Repass and A. M. Cohron & Son, upon the other part, providing for the construction of Project DA-WR-4B, in Washington, D.C., (hereinafter referred to as the project contract), and the parties hereto are desirous of combining their efforts and equipment and making provision for the performance of said project contract by means of the joint facilities of the two contracting firms mentioned above, and the parties hereto being the owners of the controlling interests in the firm mentioned, wish to enter into this agreement for the purpose of evidencing the mutual rights and obligations of the parties hereto, with respect to said project contract. "Now, therefore, in consideration of the mutual covenants and agreements herein contained, &t &s agreed between the parties hereto as follows: "1. The parties to this contract shall use their best efforts for the successful performance and completion of the project contract referred to above with the Government of the District of Columbia, for the accumulation of profits in connection therewith, giving such time and attention to the *213 prosecution of said work as to accomplish the most successful termination of the venture to the mutual advantage of the parties hereto and in order that said contract may be completed as promptly, efficiently and economically as possible, in accordance with the contract, plans and specifications." The parties agreed to contribute equally to a bank account of $15,000 to be opened in the name of "Alexander & Repass and A. M. Cohron & Son" and to make additional necessary similar contributions. They agreed that all transactions should clear through this account with checks to be signed and countersigned by the respective parties, or as otherwise agreed. The agreement continued: "It is agreed that the parties hereto will provide for the use of such machinery and equipment belonging to Alexander & Repass and A. M. Cohron & Son as may be available and useful in the prosecution of the project contract. For the use of such machinery and equipment as may be furnished by Alexander & Repass or A. M. Cohron & Son, and actually used on the project contract, rental shall be paid the owner, * * *
"Upon the completion and acceptance of the project contract and when final settlement therefore *214 has been made and received, the profits and losses growing out of the construction of the project contract shall be divided equally by the three parties hereto A. A. Alexander receiving one-third (1/3) of the net profits arising from the venture, Maurice A. Repass receiving one-third (1/3) of said net profits and A. M. Cohron receiving one-third (1/3) of said net profits, and each of said parties shall likewise be equally liable for their respective one-third share of any losses. * * *
"If any party hereto shall die during the continuance of the partnership created by this instrument and prior to the completion of the project contract, the surviving partner or partners shall as and from the date of such death, and if more than one, in the proportions in which they were at such date entitled to share in the net profits of the partnership, succeed to the share of the deceased partner in the partnership business and the property thereof and shall assume all of the debts, liabilities and obligations of the partnership, and pay to the representative of the deceased partner, the net value of such share at the date of such death, after making provision for the payment of the existing *215 debts and liabilities of the partnership, such valuation, in case of dispute, to be determined by arbitration in accordance with the arbitration provision contained in this agreement. Provided, however, that the surviving partner or partners may elect not to purchase such share on giving notice in writing of such election to the representatives of said deceased partner, or if there be no legal representative, then on written notice to the widow of such deceased partner, within thirty (30) days after his death, and in that case the partnership shall be deemed to have terminated at the date of the giving of such notice and in the meantime, the business shall be deemed to have been carried on by the surviving partner or partners on the joint account of themselves and the legal representative of the deceased partner. However, nothing herein contained shall be construed to obligate such surviving partner or partners to purchase the share of such deceased partner. If the surviving partner or partners shall not exercise the option of purchasing the share and interest of the deceased, or if the partnership shall be determined or expire during the joint lives of the partners prior to the expiration *216 and the assets distributed, according to law. In case of the termination of this partnership by operation of law because of the death of any party hereto, or otherwise, no allowance shall be made for goodwill in valuing the share or interest of such deceased partner in the project contract. * * *
"The partnership created by this agreement shall commence upon the execution of this instrument and be terminated upon final settlement of the project contract and the distribution of the net profits or payment of the losses growing out of the performance of the project contract." Donald did not sign this agreement. A. M. Cohron & Son obtained permission to withdraw from the Second Avenue project in July, 1942, and shipped the machinery to Washington. Donald supervised the shipping job and then went to Washington to work on the project. They spent considerable time getting organized and did not get the work under way until September. At about this time petitioner and Donald spent considerable time finding tracts of timber. When they found one, they spent about ten days organizing a mill camp to produce piling and heavy timber for the job which was at a complete standstill until *217 this material arrived. There were about 100 men employed on the Washington job at one time. Their supervisors were men hired in Washington. Cohron and Alexander each had one of their superintendents there, who reported to petitioner, Alexander, Repass and Donald. They would often meet in the office and talk things over and make plans. Don bossed himself and bossed the men just as much as did petitioner. In allocating the work in Washington, by agreement, Alexander handled the office work. Donald had the responsibility of getting machinery placed where it was needed; he attended to repair work; he expedited rationing to secure gas, fuel oil, and rubber boots by appearing before rationing boards several times a week; he sometimes ran a dragline for several hours when an operator did not show up. Donald had no title; he was listed as a timekeeper. This was in order to satisfy the union and permit him to do the work above mentioned. Donald phoned Washington employment offices a good many times to have them send out workers; he watched the men to see which should be fired. If his recommendation agreed with that of one of the others, the man would be fired. Donald traveled the East Coast *218 from Washington to New York buying materials. He did not buy heavy material, such as steel and rock, but scarce small items. Petitioner signed for the payroll and signed the contract with the District of Columbia on the original job. On the Washington job petitioner spent a large percentage of his time figuring out the important form work for the carpenter foreman. In reply to a letter from the Internal Revenue Agent in Charge at Omaha, Alexander and Repass, on November 13, 1945, wrote - "* * * that Donald was in our employ on that particular job as timekeeper at a salary of $50.00 per week. "Donald Cohron also worked for the Firm of Alexander & Repass in the spring of 1942. A copy of his earnings was furnished your Mr. Heles. "While in our employ he did not serve in any way in a supervising capacity." The following was attached to the letter: RECORD OF EMPLOYMENT AND EARNINGS
To:
Form: Donald Cohron
Alexander & Repass
1942: Week
Tot.
Rate
Ending
Time
Per Hr.
Earned
40
$ .75
4/18
1
1.12 1/2
$ 31.13
4/25
40
.75
30 1/2
1.12 1/2
64.31
5/2
40
.75
27
1.12 1/2
60.37
5/9
40
.75
11 1/2
1.12 1/2
42.94
Total Paid
$198.75
*219 To: Donald Cohron
From: Alexander &
Repass & A. M. Cohron
& Son
1942: Wk. Ending 7/29
$50.00
Wk. Ending 8/5
50.00
Wk. Ending 8/12
50.00
Wk. Ending 8/19
50.00
Wk. Ending 8/26
50.00
Wk. Ending 9/2
50.00
Wk. Ending 9/9
50.00
Wk. Ending 9/16
50.00
Wk. Ending 9/23
50.00
Wk. Ending 9/30
50.00
Wk. Ending 10/7
50.00
Wk. Ending 10/14
50.00
Wk. Ending 10/21
50.00
Wk. Ending 10/28
50.00
Wk. Ending 11/4
50.00
Wk. Ending 11/11
50.00
Wk. Ending 11/18
50.00
Wk. Ending 11/25
50.00
Wk. Ending 12/2
50.00
Wk. Ending 12/9
50.00
Wk. Ending12/16
50.00
Wk. Ending 12/23
50.00
1943: Wk. Ending 1/6
20.00
Wk. Ending 1/13
50.00
Wk. Ending 1/20
50.00
Wk. Ending 1/27
50.00
Wk. Ending 2/3
50.00
Wk. Ending 2/10
50.00
Wk. Ending 2/17
50.00
Wk. Endinh 2/24
50.00
Wk. Ending 3/3
50.00
Wk. Ending 3/10
25.00
Total paid
$1,545.00
No Drawing Account nor Personal Expense Account paid Donald Cohron. Union Fees paid Donald Cohron March 4, 1943, $44.00. Previous expense account filed by him was January 27, 1943. These expenses were for miscellaneous material for the job paid by him and reimbursed by the Firm. When he was 10 years *220 old Donald went out on construction jobs with petitioner. When he was 16 years old he delivered newspapers, and since that time bought his own clothes and paid his own doctor bills. After the January 2, 1942, agreement Donald offered to pay board at home, but petitioner would not have it. At that time petitioner told Donald that any trouble he got into he would have to get out of himself - that Donald was then a man. While Donald was in Washington he paid his own living expenses and part of petitioner's. A. M. Cohron & Son had a bank account at the Valley National Bank in Des Moines, upon which petitioner, Donald, and Mrs. Cohron (under a power of attorney) could write checks. Neither petitioner nor Donald had a personal bank account other than this one. At one time Donald performed outside work away from home for two months for which he received wages. When he came home he put them in the company business. Donald writes checks for his own expenses which he marks "personal." They are charged on the books against his share of the earnings. The Washington job was still under way when Donald was inducted into the Army on March 17, 1943. The work was not completed until some time *221 before the end of 1943. After its completion petitioner went back to Des Moines. He had a complete relapse and went all to pieces. He did no more work under the partnership agreement until Donald returned after his discharge in 1946, when they immediately resumed partnership activities in contracting and construction. Petitioner is presently so engaged. In 1942 Donald earned $486.41 working for Kramme & Jensen, and $1,100 working on the Washington job. In 1943 he earned $445 up to March 17, 1943, when he was drafted. A. M. Cohron & Son filed Partnership Returns of Income for 1942 and 1943, in which the partnership net income was equally divided between petitioner and Donald. In his notice of deficiency respondent stated: "Your contention that your minor son, Donald P. Cohron, was a bona fide partner, taxable on a portion of your business income including a part of your distributive share of income of the partnership, Alexander & Repass & A. M. Cohron & Son is denied. "(b) This adjustment represents salary and wages received by your minor son. Since your son had not been emancipated, the income is taxable to you." And - "For the same reasons as stated for the year 1942, *222 the income from the business conducted under the name, A. M. Cohron & Son, including your distributive share of partnership income of the partnership, Alexander & Repass & A. M. Cohron, is held to be taxable to you in its entirety. Your contention that your minor son is a bona fide partner for income tax purposes is denied. * * *" Petitioner and Donald really and truly intended to operate as partners in the period in question, and the partnership between them was valid and bona fide for tax purposes. Opinion On the partnership issue this case is a stronger one for petitioner than Isaac Blumberg, 11 T.C. 663 (acq. I.R.B. 1949-1CB1). Work under the partnership agreement was actually undertaken for a significant period before the son was drafted, whereas in Isaac Blumberg, supra, the agreement was never actually effectuated. On authority of that case the partnership here in question must be sustained for tax purposes. Respondent also takes the position that the wages earned by Donald ($1,503.41 in 1942, and $445 in 1943) are to be taxed to petitioner because Donald is not shown to have been emancipated under the law of Iowa. Although the Internal Revenue *223 Code has now been changed (cf. Internal Revenue Code, section 22(m)), the rule during the period in question was that in such instances the parent was required to include the earnings of the minor in his return where he has the legal right to them. Regulations 111, section 29.51-3. Unless the minor has been emancipated, such is the law of Iowa. Winnebago Auto Co. v. Bilstad, Iowa, 1942, 1 N.W. (2d) 704, 706. The state law, however, does not require any formal act of emancipation, Crary v. Hoffman, 115 Iowa 332, 88 N.W. 833, quoted with approval in Winnebago Auto Co. v. Bilstad, supra, and we believe that the record adequately discloses the fact of Donald's emancipation. It appears that Donald, with his father's knowledge and assent, did not continue school, worked and retained his wages, sometimes worked away from home, paid his own personal expenses, and was advised that he was "on his own." Reinforcing this conclusion are Donald's age. [1] his enterprise, and independence, and the partnership itself. See Walter J. Runyon, 8 T.C. 350. This issue must also be decided for petitioner. *224 Decision will be entered under Rule 50. Footnotes
1. Cf. Jacob DeKorse, 5 T.C. 94, 102↩, where the minor was 15 years old and his mother acted as his guardian.